***UNITED STATES DISTRICT COURT***
***DISTRICT OF MAINE***

| | | |
|---|---|---|
| ***UNITED STATES OF AMERICA*** | ***)*** | |
| | ***)*** | |
| | ***)*** | |
| ***v.*** | ***)*** | ***Criminal No. 08-67-P-H*** |
| | ***)*** | |
| | ***)*** | |
| ***PATRICIA MORRISON,*** | ***)*** | |
| | ***)*** | |
| ***Defendant*** | ***)*** | |

***RECOMMENDED DECISION ON MOTION TO SUPPRESS***

Patricia Morrison, charged in three counts of an eight-count superseding indictment with conspiracy to distribute and to possess with intent to distribute cocaine base in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count One), distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1) (Count Five), and conspiracy to engage in the business of dealing in firearms without being a licensed firearms dealer in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D) (Count Six), *see* Second Superseding Indictment ("Indictment") (Docket No. 12), moves to suppress statements she made on May 8, 2008, that she contends were made involuntarily and thus in violation of her Fifth Amendment rights, and taken while she was represented by counsel, in violation of her Sixth Amendment rights. *See* Motion To Suppress Statement of May 8, 2008 ("Motion") (Docket No. 103) at 1. An evidentiary hearing was held before me on October 10, 2008, at which the defendant appeared with counsel. The government tendered three witnesses and offered three exhibits, which were admitted without objection. The defendant offered four exhibits, three of which were admitted without objection, and one of

which was admitted over objection. At the close of the evidence, counsel for both sides argued orally. I now recommend that the following findings of fact be adopted and that the Motion be denied.

## I. Proposed Findings of Fact

On the early afternoon of May 8, 2008, a group of four law-enforcement agents approached the home of the defendant in North Yarmouth, Maine, to serve an arrest warrant upon her. The group included Ernest MacVane III, a Windham, Maine, police officer assigned as a task force agent to the United States Drug Enforcement Agency ("DEA"), and Paul McNeil, an agent with the Portland, Maine, office of the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). The ATF was the lead agency in the investigation involving the defendant. The DEA was lending assistance at the ATF's direction.

MacVane knew the defendant, having met her on prior occasions during the course of the investigation, and had developed a comfortable relationship with her. On the afternoon in question, MacVane, attired in plainclothes but wearing a police badge around his neck, drove into the defendant's driveway, blocking a car that was occupied by two individuals whom he did not recognize. He spotted the defendant on her porch. He and his fellow agents, who had arrived in separate cars and were wearing vests marked "police," approached her, and MacVane ordered her to the ground.[1] She complied, and MacVane handcuffed her. He asked if there was anyone inside her house. She said no, only her dog. She gave oral consent for police to check her home for the presence of others. She and MacVane went inside the house briefly so that she could calm her dog down while one or more officers made a quick sweep of the house.

[1] MacVane did not draw his service weapon when he approached the defendant. He did not recall whether his fellow agents did so.

MacVane then escorted her to his car.[2] Because of his comfort level with her, he removed her handcuffs and permitted her to sit beside him in the front seat. For a minute or two, the two were alone in the car, although they were quickly joined by McNeil, who got into the back seat.

The defendant was confused, taken aback, and wanted to know why she was being placed under arrest. MacVane explained that he had a warrant for her arrest for drug trafficking. Within minutes of her arrest, he administered *Miranda* warnings to her.[3] Nothing of substance was said prior to administration of those warnings. The defendant stated that she understood each of her *Miranda* rights, which MacVane read aloud to her, and agreed to waive them and answer questions. She memorialized her understanding and waiver of her rights on a written form witnessed by MacVane and McNeil, upon which McNeil indicated that he witnessed her signature at 2:10 p.m. *See* Gov't Exh. 1.

MacVane advised the defendant that, although she was going to go to jail, she might have an opportunity to be released from jail and cooperate. He told her that in order to do that, she would need to waive her right to be brought immediately before a magistrate judge. He presented to her a so-called "Rule 5 Waiver" form, which he read aloud to her, permitted her to read, and which she signed in his and McNeil's presence. *See* Gov't Exh. 2. The form states that the defendant waives her right to a speedy appearance before a federal magistrate judge, an appearance during which, among other things, she "would be informed of the general circumstances under which [she] could be released before t[ri]al and the magistrate-judge would either set bail or order [her] detained." Gov't Exh. 2.

---

[2] On direct examination, MacVane omitted mention of having gone into the defendant's house before taking her to his car. He remembered on cross-examination that he had done so. After his memory was jogged, he had a specific recollection of the defendant having calmed her dog, and he was certain he never left her alone before escorting her to his car.

[3] Per *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

MacVane denied that, at any point that day, he promised the defendant that, if she cooperated, she would be brought immediately before a magistrate judge so that she could be set free. MacVane presented to the defendant a final form while seated in his car, a consent to search her residence, reflecting her prior oral consent to a search. She also executed that form. *See* Gov't Exh. 3. McNeil indicated that he witnessed the defendant's signature on that form at 2:15 p.m. *See id*. During the brief search of the defendant's home conducted on May 8, 2008, no person was found in her home and no contraband was spotted in plain view.[4]

Although McNeil did not know that MacVane and the defendant were acquainted, that fact became apparent to him shortly after he joined them in MacVane's car. The defendant was calling MacVane by his first name and said to him at one point, "I'm with you, Ernie." While the defendant was anxious, having just been unexpectedly arrested at her home, it was apparent to McNeil that she wanted to cooperate. McNeil, who is familiar with the signs and symptoms exhibited by people who are under the influence of drugs or alcohol or undergoing withdrawal from such substances, including sweating, difficulty focusing, and shaking of the legs or arms, saw none of those signs or symptoms in the defendant. McNeil heard MacVane explain to the defendant that, if she wished to cooperate, she would need to be interviewed that afternoon, a process that would take an extended period of time, thus necessitating the waiver of her appearance before a magistrate judge. The defendant exhibited no doubt or lack of understanding of that waiver. In fact, McNeil perceived her response to executing the Rule 5 Waiver as enthusiastic.

MacVane did not intend to interview the defendant himself but, rather, to bring her to Portland where other agents were waiting to do so. He was under time constraints that day

[4] On direct examination, MacVane testified that a brief search of the home was conducted after the defendant executed the consent-to-search form. However, on cross-examination, he recalled that a protective sweep was conducted prior to the time he took her to his car.

because he wished to be able to attend the funeral the following day of a close friend. In addition, the ATF, rather than the DEA, was the lead federal agency in the investigation. He explained to the defendant that he was going to take her to the Portland DEA office to have her talk with a couple of agents who were more familiar than he was with the circumstances of her arrest. Approximately 10 minutes after MacVane had first arrested the defendant, he drove her to the DEA office in Portland, with McNeil following in a separate car. During the 15- to 20-minute drive, the defendant remained in the front seat, unhandcuffed, although she and MacVane were alone in his car. During the drive, the defendant disclosed to MacVane her drug supplier. MacVane asked if the defendant had the supplier's phone number, and she said that it was stored in a cell phone that state agents had seized. While *en route*, MacVane phoned Maine Drug Enforcement Agency ("MDEA") agent Steve Gorham to inquire whether it was possible to obtain the seized phone or phones. He eventually learned that the phones had been transferred to the MDEA's evidence depot in an undisclosed location in another town and were not immediately available.[5]

The defendant's demeanor during her encounter with MacVane on May 8, 2008, was cooperative. She displayed no hesitation to waive her *Miranda* rights or her right to a speedy appearance before a magistrate judge or to answer MacVane's questions. The tone of her conversation with MacVane, with whom she was on a first-name basis, was pleasant. MacVane noticed that she had a little glass pipe and what appeared to be about a half gram of cocaine base, consistent with personal use, in her purse. MacVane, who is familiar with indicia that someone is under the influence of drugs or alcohol, or is in withdrawal from such substances, detected no sign that the defendant was in either state.

[5] Although his memory was murky on the details, MacVane acknowledged on cross-examination that the conversation during the drive to the Portland DEA office had covered topics relevant to the investigation, including the availability of the phone number of the drug supplier.

At the DEA office in Portland, MacVane brought the defendant to an interview room upstairs and introduced her to Thomas Crowley, a special agent with the ATF's Boston division, and Boston police detective Marvin Wright, whom he explained would interview her. Crowley and Wright had traveled from Boston to Portland in the hope of interviewing the defendant following her planned arrest. However, neither traveled to North Yarmouth to participate in the arrest itself. McNeil also was present for part of the interview, although he left before its conclusion. MacVane spoke briefly with Crowley, conveying that the defendant had received *Miranda* warnings and had been very cooperative with him. He wished the defendant good luck and left the room. He attended to other matters at the DEA office, including commencing his report of the arrest and securing evidence, but returned to the interview room at various points and was present for parts of the interview.[6]

At the outset of the interview, Crowley orally administered a second set of *Miranda* warnings to the defendant. During the course of the interview, he found her to be cordial, friendly, and relaxed. He is familiar with the signs and symptoms displayed by persons under the influence of drugs or alcohol or suffering from withdrawal from the same, but detected no such signs or symptoms in the defendant. She was coherent, conversational, and displayed no confusion about the questions she was asked. At the end of the interview, which lasted about an hour or an hour and a half, Crowley made it known to the defendant that she was not then going to go free or appear before a magistrate judge. She did not appear overly surprised, did not argue about it, and seemed resigned to it. During the time that McNeil was present in the interview room, he did not hear the defendant mention or complain about any promise that had been made

[6] MacVane testified that he was not present for any part of the interview after he introduced the defendant to Crowley and Wright and left the room. However, Crowley testified that MacVane was present throughout the interview and that Crowley turned to him from time to time for help with a local issue or question, and McNeil testified that MacVane was in and out of the interview room, although MacVane did not participate as an interrogator.

to her.

After the interview ended, MacVane transported the defendant to the Cumberland County Jail. The defendant may have expressed surprise to MacVane, while *en route* to the jail or while pulling into its sallyport entrance, that she was going to jail instead of being bailed. MacVane explained to her that the procedure is different in the federal system than in the state system, that there are no bail commissioners available in the federal system to provide bail from jail, and that, instead, one must appear in court. The defendant did not express anger that she was not going to be released or go before a federal magistrate judge, nor did she accuse MacVane of having deceived her or of having reneged on any promise to let her go if she spoke with law enforcement.[7]

MacVane, who had assisted in the investigation that led to the defendant's arrest, was aware on May 8, 2008, that the MDEA also was investigating the defendant, that MDEA agents had searched her house on April 8, 2008, and that they had then found scheduled drugs, probably cocaine. MacVane assumed that the defendant had been charged as a result of that search because he knew from a computer search that she was subsequently on bail conditions. Prior to May 8, 2008, MacVane had spoken with MDEA agent Gorham, and each had shared information with the other regarding the agencies' investigations into the defendant's activities. Nonetheless, neither the DEA nor the ATF had known ahead of time that the MDEA was planning to search the defendant's house on April 8, 2008. The MDEA did not coordinate that search with either agency. Further, while MacVane had had some conversations with the MDEA's Gorham, Crowley, the lead agent on the case, had never spoken with anyone from the MDEA concerning

[7] On redirect examination, MacVane testified that he could not remember exactly when this conversation took place, and that it may have transpired while he was explaining the Rule 5 Waiver form to the defendant at her residence. For purposes of resolution of the instant motion, I will assume that the conversation took place either at the jail or *en route* there.

it.

A complaint was filed against the defendant on February 22, 2008, in the Maine Superior Court, Cumberland County, charging her with one count of operating a motor vehicle under the influence of intoxicants on or about January 30, 2008, in violation of 29-A M.R.S.A. § 2411(1), and one count of intentional or knowing possession of what she knew or believed to be a schedule W or X drug, namely cocaine and/or cocaine base, on or about January 30, 2008, in violation of 17-A M.R.S.A. § 1107A(1)(C). *See* Complaint ("February 22 Complaint"), Defendant's Exh. 3. Attorney Clifford Strike was appointed to represent her on those charges on February 29, 2008. *See* Docket Record, Defendant's Exh. 3, at 2. The possession charge initially was a Class C charge; however, it was dropped to a misdemeanor (Class D) on February 29, 2008. *See id*. at 1. The charges still were pending as of May 8, 2008. *See id*. at 2.

A separate complaint was filed against the defendant on April 9, 2008, in the Maine Superior Court, Cumberland County, charging her with one count of trafficking in schedule W drugs, namely cocaine, on or about April 8, 2008, in violation of 17-A M.R.S.A. § 1103(1-A)(A), one count of trafficking in schedule W drugs, namely cocaine base (crack cocaine), on or about April 8, 2008, in violation of 17-A M.R.S.A. § 1103(1-A)(A), and one count of possession of a schedule W drug, namely hydrocodone, on or about April 8, 2008, in violation of 17-A M.R.S.A. § 1107A(1)(B)(5). *See* Complaint ("April 9 Complaint"), Defendant's Exh. 4. Attorney Heather Gonzalez was appointed to represent the defendant on those charges on June 10, 2008. *See* Docket Record, Defendant's Exh. 4, at 2. The charges were still pending as of May 8, 2008. *See id*.

MacVane prepared a report, bearing his signature and dated May 8, 2008, of his participation in the defendant's arrest. *See* Defendant's Exh. 2. The report bears the signature of

a supervisor alongside the date May 9, 2008. *See id*. MacVane acknowledged that he may not have finalized that report until August 12, 2008, the date he faxed it to the Assistant United States Attorney. Crowley prepared a detailed report of the interview of the defendant in the Portland DEA office on May 8, 2008. *See* Defendant's Exh. 1. He stated, among other things, that at approximately 1:30 p.m. that day, the arrest team had observed the defendant leaving her residence and had approached her in her front yard. *See id*. at 1.

## II. Discussion

The defendant contends that statements she gave to agents on May 8, 2008, should be suppressed on two alternative bases: that (i) she was coerced to confess, in violation of her Fifth Amendment rights, by a promise of quick bail, and (ii) she was questioned in violation of her Sixth Amendment right to counsel, which had attached with respect to identical pending state charges. *See* Motion at 2-6. The government bears the burden of demonstrating the lawfulness of the challenged conduct. *See United States v. Leon-Delfis*, 203 F.3d 103, 110 (1st Cir. 2000) (intentional relinquishment of right to counsel); *United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992) (*Miranda* compliance); *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990) (voluntariness of confession). For the reasons that follow, I find that the government carries its burden.

### A. Voluntariness of Waiver, Confession

Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments. *See, e.g.*, *United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002). In the face of a defendant's claim that his confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will. *Chambers v. Florida*, 309 U.S. 227, 239-40 (1940). As this

language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). *See also, e.g.*, *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (in context of voluntariness of confession, "[t]he relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

In a similar vein, "[t]he voluntariness of a waiver has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *United States v. Hilario-Hilario*, 529 F.3d 65, 74 (1st Cir. 2008) (citation and internal punctuation omitted); *see also, e.g.*, *United States v. Rojas-Tapia*, 446 F.3d 1, 7 (1st Cir. 2006) ("[T] he fact that Rojas-Tapia has a relatively low I.Q., standing alone, is not dispositive of the waiver determination. A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness.").

In her papers, the defendant suggested that her will was overborne, and she was induced to waive her *Miranda* rights and to supply statements to agents, by virtue of a promise to bring her to a federal magistrate judge and have her bailed out on the same day if she provided a statement, coupled with a vulnerability caused by her entry into a period of withdrawal from cocaine base, to which she was addicted. *See* Motion at 4-5. At the close of her evidentiary hearing, her counsel refined this claim, arguing that:

1. There is a serious question as to whether the defendant signed the *Miranda*, Rule 5 Waiver, and consent-to-search forms at her home in North Yarmouth versus later that day at the Portland DEA office, given that Crowley's report indicated that the arrest team arrived at the defendant's home at approximately 1:30 p.m., *see* Defendant's Exh. 1, McNeil indicated that he witnessed the defendant's signature on the *Miranda* and consent-to-search forms at 2:10 p.m.

and 2:15 p.m., respectively, *see* Gov't Exhs. 1, 3, and both MacVane and McNeil testified that agents were at the defendant's North Yarmouth home for only a very brief period of time, approximately 10 minutes. Thus, the government's time frames do not mesh.

2. MacVane's denial notwithstanding, he likely promised the defendant on the drive from her home to the Portland DEA office that she would be released on bail later that day if she signed the various forms and gave a statement to agents. At that time, MacVane and the defendant were alone. The defendant reposed trust and faith in him. The giving of the alleged promise is corroborated, in counsel's view, by MacVane's vague recollection on cross-examination that the defendant did express surprise that she was being brought to the Cumberland County Jail. By contrast, in counsel's view, MacVane's denial that any such promise was made is undercut by various indicia of a lack of credibility, including the cloudiness of MacVane's memory generally, the inconsistency of his testimony with that of Crowley and McNeil on various points, including whether MacVane was present at the defendant's interview at the Portland DEA office, the cursoriness of MacVane's official report of events of May 8, 2008, *see* Defendant's Exh. 2, and his acknowledgement on cross-examination that he may not have completed that report until August 12, 2008, the date he faxed it to the Assistant United States Attorney, in which case he and his supervisor evidently backdated it, *see id*.

At hearing, counsel for the government rejoined that (i) the defendant's argument is built on pure conjecture, (ii) while there concededly are inconsistencies and vagaries in MacVane's testimony, both MacVane and McNeil were clear that the *Miranda* and Rule 5 waivers were given in MacVane's car at the defendant's residence in North Yarmouth and that no promise of bail was made, (iii) the report of Crowley regarding the time at which the arrest commenced is not the equivalent of a time-stamp, given that Crowley was not personally present at the

defendant's North Yarmouth home and obtained that information second-hand from an unknown source, (iv) there is zero evidence that the alleged promise ever was made, (v) to the extent that the defendant may have been confused as to whether she was to be bailed that day, her confusion did not stem from any coercive police activity, and (vi) there is no evidence of record that the defendant was either under the influence of drugs or alcohol or in withdrawal from any such substances.

The government has the better of the argument. Crowley's second-hand statement in his report that agents arrived at the defendant's home at about 1:30 p.m. does not undermine the weight of MacVane's and McNeil's unequivocal testimony that MacVane went over the *Miranda,* Rule 5 Waiver, and consent-to-search forms in MacVane's car with the defendant in the driveway of her home moments after her arrest. The Rule 5 Waiver form on its face undercuts the defendant's argument that she was promised bail if she cooperated. The form clearly waives her right to a speedy appearance before a federal magistrate judge, an appearance during which, it explains, she "would be informed of the general circumstances under which [she] could be released before t[ri]al and the magistrate-judge would either set bail or order [her] detained." Gov't Exh. 2. McNeil corroborated MacVane's testimony that, during the time both agents were present in MacVane's car with the defendant, and she was being asked to decide whether to waive her *Miranda* and Rule 5 rights and to cooperate, no promise of bail was made to her.

Beyond that, Crowley testified that the defendant was told at the close of the interview at the Portland DEA office that she was not then going to go free or appear before a magistrate judge. She did not appear overly surprised, did not argue about it, and seemed resigned to it. During the time that McNeil was present in the interview room, he did not hear the defendant

mention or complain about any promise that had been made to her.

If, in fact, the defendant was laboring under a misapprehension that a bail commissioner would be available at the jail, her confusion evidently stemmed from a unilateral expectation rooted in her experience with the state bail system, not from any promise on the part of federal agents. While MacVane acknowledged that the defendant may have expressed surprise, either *en route* to the jail or on arrival there, that she was being jailed, he recalled having explained to her the differences between the state and federal bail systems, and was clear that she was not angry with him or accusing him of having reneged on any promise. A unilateral hope of lenient treatment does not render a confession involuntary. *See, e.g.*, *United States v. Rowley*, 975 F.2d 1357, 1361 (8th Cir. 1992) ("Although Rowley's statements were given in the hope of leniency, they were not given with the promise of leniency, and thus were not involuntary on that score.").

Finally, as counsel for the government correctly pointed out, no evidence was adduced at the hearing that the defendant was either under the influence of drugs or alcohol or suffering from the effects of drug or alcohol withdrawal while in contact with agents on May 8, 2008. To the contrary, all three agents testified that she exhibited no such signs, displayed no confusion or hesitation generally, and was cogent, cooperative, and pleasant.

I am satisfied that the government has met its burden of showing that the defendant's waiver of her *Miranda* rights, both in MacVane's parked car at her home and at the Portland DEA office, was voluntary, as were her statements to agents that day.

**B. Asserted Sixth Amendment Violation**

The defendant's Sixth Amendment claim, as refined by her counsel at hearing, is that:

1. On May 8, 2008, the defendant was represented by counsel with respect to charges filed in state court on February 22, 2008, and had a request for counsel pending with

respect to charges filed in state court on April 9, 2008. *See* Defendant's Exhs. 3-4.

2. The defendant is being charged in the instant case with the same criminal conduct, during the same time period, as underlay the charges pending against her in the state cases, namely possession with intent to traffic in cocaine.

3. MacVane, the agent who administered *Miranda* warnings to the defendant and initially sought her cooperation, was aware that she had been arrested and was on bail on state charges.

4. Federal agents violated the defendant's Sixth Amendment rights by asking her to waive her *Miranda* rights despite their collective knowledge (via MacVane) that she was represented by counsel on identical charges in state court.

The government denies that the state and federal charges are identical and points out that, in any event, the First Circuit has adopted the so-called "dual sovereignty doctrine," pursuant to which, absent coordination between state and federal bodies, which has not here been shown, even identical charges are considered separate for Sixth Amendment purposes. The government is correct.

"After the right to counsel has attached, the government and its agents are constitutionally prohibited from deliberately seeking information from an accused in the absence of defense counsel. The right to counsel is offense specific, however, so an accused charged with one crime cannot invoke a right to counsel with respect to other uncharged crimes." *United States v. Bartelho*, 129 F.3d 663, 674-75 (1st Cir. 1997) (citations and internal quotation marks omitted).

"[W]hen the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test."

*Texas v. Cobb*, 532 U.S. 162, 173 (2001) (referencing *Blockburger v. United States*, 284 U.S. 299 (1932)) (footnote omitted). Pursuant to the *Blockburger* test, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id*. (citation and internal quotation marks omitted).

The defendant and others are charged in Count One of the instant Indictment with knowingly and intentionally conspiring with one another and other persons known and unknown to commit the offense of distribution and possession with intent to distribute controlled substances, including 50 grams or more of a mixture or substance containing cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1). *See* Indictment at 1. This conduct is alleged to have begun on a date unknown, but no later than December 2006, and to have continued until a date unknown, but no earlier than February 8, 2008, in the District of Maine and elsewhere. *See id*. The defendant also is charged, in Count Five, with knowingly and intentionally distributing five grams or more of a mixture or substance containing cocaine base on about March 11, 2008, in violation of 21 U.S.C. § 841(a)(1). *See id*. at 3.

The February 22 Complaint contains one charge possibly relevant to the instant Indictment: intentional or knowing possession of a schedule W drug, namely cocaine and/or cocaine base, on or about January 30, 2008, in violation of 17-A M.R.S.A. § 1107A(1)(C). *See* February 22 Complaint. The state charge of simple possession of cocaine is not the same offense, for *Blockburger* purposes, as the federal charge of conspiracy to distribute cocaine or cocaine base outlined in Count One of the Indictment. The state charge requires proof of possession of an illegal substance but not proof of an agreement. *See* 17-A M.R.S.A. § 1107-A(1)(C) (person is guilty "if the person intentionally or knowingly possesses what that person

knows or believes to be a scheduled drug, which is in fact a scheduled drug, and the drug is . . . [a] schedule W drug[.]"). The federal charge requires proof of an agreement but not proof of possession. *See, e.g.*, *United States v. Caraballo-Cruz*, Nos. 92-2316, 92-2319, 1994 WL 38619, at *3 (1st Cir. Feb. 10, 1994) ("In order to prove a defendant is guilty of conspiracy under 21 U.S.C. § 846, the government must show, beyond a reasonable doubt, that the defendant knowingly and voluntarily participated in an agreement to violate the law and that the defendant did so with the intent to commit the underlying substantive offense."). *See also, e.g.*, *United States v. Terrell*, 191 Fed. Appx. 728, 733 (10th Cir. 2006) ("It is well-settled that a substantive crime and a conspiracy to commit that crime are not the 'same offence' for double jeopardy purposes. A conspiracy charge requires only proof of an agreement to commit the offense, not possession of an illegal substance. On the other hand, a possession charge requires (obviously) proof of possession, and no proof of an agreement is necessary. Therefore, the *Blockburger* test requiring *each* charge to contain a separate proof of fact is satisfied here.") (citation, internal quotation marks and footnotes omitted) (emphasis in original); *United States v. Somers*, 950 F.2d 1279, 1282-83 (7th Cir. 1991) ("The law is well-settled that the commission of a substantive offense and the conspiracy to commit that offense are two separate crimes.").

Nor is the state charge of simple possession, at least in this instance, the same offense as outlined in Count Five of the Indictment. The offenses appear to relate to different acts or transactions, with the February 22 Complaint alleging possession of cocaine and/or cocaine base on or about January 30, 2008, and the Indictment alleging distribution of cocaine base on about March 11, 2008. *See United States v. Rigaud*, 550 F. Supp.2d 193, 197 (D. Mass. 2008) (because federal charges "did not arise out of the same transaction" as state charges, "they cannot be the same offense as any state charge").

The April 9 Complaint contains two charges possibly relevant to the instant Indictment, one of trafficking in cocaine on or about April 8, 2008, and one of trafficking in cocaine base (crack cocaine) on or about April 8, 2008, both in violation of 17-A M.R.S.A. § 1103(1-A)(A). For the reasons discussed above, even assuming *arguendo* that the time periods for the state trafficking charges and the federal conspiracy charge overlap, neither of the two charged state offenses is the same offense as the federal conspiracy charge. Commission of the underlying crime of drug trafficking is an element of both state charges, but agreement is not. *See* 17-A M.R.S.A. § 1103(1-A)(A) ("[A] person is guilty of unlawful trafficking in a scheduled drug if the person intentionally or knowingly trafficks in what the person knows or believes to be a scheduled drug, which is in fact a scheduled drug, and the drug is . . . [a] schedule W drug."). As noted above, agreement is an element of the federal conspiracy charge, but commission of an underlying substance offense (in this case, drug trafficking) is not. *See, e.g.*, *Caraballo-Cruz*, 1994 WL 38619, at *3.

Nor are the drug-trafficking offenses charged in the April 9 Complaint the same offenses as the drug distribution charge in Count Five of the Indictment. The two charges of drug trafficking on or about April 8, 2008, seemingly relate to separate acts or transactions than the distribution of cocaine base targeted in Count Five of the Indictment, which is alleged to have occurred on about March 11, 2008.

Because, as measured by the *Blockburger* test, the offenses with which the defendant is charged in the instant case are not the same offenses as those with which she was charged in state court via the February 22 and April 9 complaints, federal agents committed no Sixth Amendment violation in seeking from her a waiver of her *Miranda* rights on May 8, 2008.

In any event, even assuming *arguendo* that one or more of the state offenses could be

characterized as the same as one or more of the instant federal charges, the First Circuit has adopted the "dual sovereignty doctrine," pursuant to which "a defendant's conduct in violation of two separate sovereigns . . . constitutes two distinct offenses" even when the essential elements of both the state and federal offenses are the same. *See United States v. Coker*, 433 F.3d 39, 43 (1st Cir. 2005). The First Circuit has recognized that "an exception to the dual sovereignty doctrine . . . exists where one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in its own proceedings." *Id*. at 45 (citation and internal quotation marks omitted). With respect to such a claim, the First Circuit has adopted a shifting burden of proof:

> [T]he defendant must produce some evidence tending to prove that . . . one sovereign was a pawn of the other, with the result that the notion of two supposedly independent prosecutions is merely a sham. If the defendant proffers evidence sufficient to support such a finding – in effect, a prima facie case – the government must shoulder the burden of proving that one sovereign did not orchestrate both prosecutions, or, put another way, that one sovereign was not a tool of the other.

*United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996). *See also, e.g., Rigaud*, 550 F. Supp.2d at 196 ("In a case such as this one, where there are some state and some federal charges, even if a state charge is the 'same offense' as a federal charge under *Blockburger*, the offenses may not be the same for purposes of the Sixth Amendment. . . . [W]hen the two statutory provisions under which the defendant is charged are in the laws of separate sovereigns (i.e., federal and state), the two offenses are not the same except when one sovereign controls the prosecution of another.").

The defendant falls well short of making out a *prima facie* case that the state (via the MDEA) was a pawn of the federal government (via the ATF and/or the DEA), or *vice versa*. While MacVane and his MDEA counterpart, Gorham, shared some information regarding the

defendant, and MacVane sought Gorham's assistance in retrieving cell phones that the MDEA had seized, there is no evidence that the MDEA was coordinating its efforts overall with the ATF and the DEA. Indeed, the MDEA did not apprise MacVane or Crowley that it intended to conduct a search of the defendant's house on April 8, 2008. There simply is no evidence, prior to the defendant's arrest on May 8, 2008, of sustained cooperation, or collusion, between the relevant state and federal bodies in their investigations of the defendant's activities.

## III. Conclusion

For the foregoing reasons, I recommend that the Motion be **DENIED**.

## ***NOTICE***

***A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.***

***Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.***

Dated this 30th day of October, 2008.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge